IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| ROGER A. MANN, Administrator of the<br>Estate of Tanya Diane Mann, Deceased,<br><br>     Plaintiff,<br><br>v.<br><br>C. H. ROBINSON WORLDWIDE, INC.,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 7:16-cv-00102 |
| CHARLES DONALD MEEKS,<br>Administrator of the Estate of James Richard<br>Anderson, *et al*,<br><br>     Plaintiffs,<br><br>v.<br><br>C. H. ROBINSON WORLDWIDE, INC.,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 7:16-cv-00104 |
| JEREMY W. JOHNSON,<br><br>     Plaintiff,<br><br>v.<br><br>C.H. ROBINSON WORLDWIDE, INC.,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 7:16-cv-00140<br><br>By:  Elizabeth K. Dillon<br>     United States District Judge |

**MEMORANDUM OPINION**

These three cases are related and have been consolidated for pre-trial proceedings and for

the liability phase of trial.  Pending before the court are three motions, all of which have been

filed in each of the three cases: (1) defendant C.H. Robinson Worldwide, Inc.'s (Robinson's)

motion for summary judgment; (2) Robinson's motion to exclude the expert testimony of

Thomas Corsi, one of plaintiffs' experts; and (3) plaintiffs' motion to exclude the testimony of

Robinson's expert, David Griffin.  All three motions have been fully briefed and argued before

the court, and they are now ripe for disposition.  For the reasons set forth in this opinion, the

motion for summary judgment will be denied, the motion to exclude the testimony of David

Griffin will be granted in part, denied in part, and taken under advisement in part, and the motion

to exclude the testimony of Thomas M. Corsi will be denied in part, and taken under advisement

in part.

## I.   BACKGROUND[1]

### A.  The Underlying Accidents

These three cases are brought by (or on behalf of) three people who were injured or killed

in related accidents that occurred on April 1, 2014.  On that date, Philip Emiabata was driving a

tractor trailer northbound on U.S. Interstate 81 (I-81) in Wythe County.  At the time, he was

hauling a load of laundry detergent from Laredo, Texas and was supposed to deliver it to a

location in New York City.  Robinson had hired him (through his business, known as "Phil Emia

and Sylvia Emia d/b/a/ Nova Express" (Nova))[2] to haul the load several days prior, on March 28,

2014.  At about 3:00 a.m. on April 1, Emiabata either fell asleep or became distracted and ran his

truck off the road.  He was unable to regain control of the truck and crashed through the north

and southbound median guardrails.  His truck came to a stop on its side blocking the southbound

lane of I-81, with its lights off.

---

[1]  Most of the facts related to summary judgment are not disputed; instead, the parties primarily dispute the legal significance of those facts.

[2]  Although Emiabata used the name "Emia" for him and his wife as part of his business name, it appears that Emiabata is their legal last name.

A few minutes later, a vehicle driven by Tanya Mann crashed into the overturned truck, and Ms. Mann was killed. About ten minutes after that, a tractor trailer driven by James Anderson in the northbound lanes ran over the guardrail debris. Mr. Anderson's truck plunged over an overpass and caught fire. Mr. Anderson burned to death in the truck; his passenger, Mr. Johnson, was seriously injured.

After investigating, the Virginia State Police concluded that the crashes were caused by a combination of Emiabata's fatigued driving and problems with his truck: bad brakes, improper tires, and faulty suspension.

The three plaintiffs filed suit against the Emiabatas and Nova and ultimately obtained a settlement from their insurance company. They now seek to recover from Robinson, who plaintiffs describe as "the freight broker that put the Emiabatas on the road and was making money from them at the time of the crash." (Pls.' Opp'n to Mot. Summ. J. 3, Dkt. No. 31.)[3] Plaintiffs assert that Robinson was negligent in its decision to hire Nova and the Emiabatas to haul the load of laundry detergent and that a reasonably prudent broker would not have done so. They seek both compensatory and punitive damages.

**B. Robinson's Hiring of Nova**

Plaintiffs allege that Robinson knew or should have known a number of facts about Nova and the Emiabatas—facts that were either in Robinson's own files or readily available to it. They claim that Robinson's decision to hire Nova in the face of these facts was negligent. For example, plaintiffs point to Robinson's internal notes, which show a number of complaints about the Emiabatas in the years preceding the crash here. Approximately sixteen times, either shippers or Robinson employees requested in writing that Nova be put on its "Do Not Use" list,

---

[3] The most complete briefing (containing all but one of the filings) is found in the *Johnson* case, No. 7:16-cv-140, and so record citations to the briefing and exhibits are to that case, unless otherwise noted.

either because of dishonest or violent behavior by Philip Emiabata or because of canceled pick-ups and late deliveries, some of which were caused by equipment break-downs.  (Pls.' Opp'n to Mot. Exclude Corsi, Ex. H, Dkt. No. 33-8.)

Robinson's records also showed that, although Nova only owned two tractors and trailers, Nova had approximately 30 breakdowns in the three-year span between April 2011 and April 2014.  *Id.*  According to plaintiffs, this should have put Robinson on notice that the two trucks owned by Nova were poorly maintained and thus could present a hazard.

Plaintiffs also assert that Nova was financially unstable, relying on the fact that Nova borrowed against every load it hauled for Robinson through its "Quick Pay program" and also frequently obtained advances from T-Chek, another entity owned by Robinson.  Plaintiffs point to evidence showing that the Emiabatas provided incorrect names to Robinson, and that Robinson should have known they were incorrect based on other documentation it possessed. They also point to Emiabata's deposition testimony, in which he admitted to having been fired by other motor carriers for whom he had worked, including one instance in which he was fired for having alcohol onboard a truck.

In addition to this information—most of which Robinson possessed—plaintiffs also criticize Robinson for failing to take into account publicly-available information from the Federal Motor Carrier Safety Administration (FMCSA), a Department of Transportation (DOT) agency.  Plaintiffs contend that the FMCSA data called into question Nova's safety record.

Robinson does not concede many of these facts as to what information it knew and had available to it at the time it selected Nova to carry the load, but asserts that the facts are not material to the issues raised by its summary judgment motion, and so it does not address them in its reply.  (Def.'s Reply Supp. Mot. Summ. J. 1–2, Dkt. No. 35.)  Robinson instead focuses on

the discrete legal issues raised in its motion, to which the court will turn after discussing

FMCSA's ratings and scoring system—information relevant to all of the motions pending before

the court.

## C. BASIC Scores and the FAST Act

There are two types of "scores" assigned to carriers by FMCSA.  First, FMCSA conducts

some formal compliance reviews of motor carriers and then assigns any carrier that has been

evaluated a rating of "satisfactory," "unsatisfactory," or "conditional,"  the latter of which gives

a carrier an opportunity to correct deficiencies found during the review.  Only a small percentage

of motor carriers are actually evaluated through a formal compliance review, though.  Most—

and especially small ones with only a few trucks, like Nova—never receive an evaluation or

rating and thus are listed by the FMCSA as "unrated."  Indeed, the parties here agree that 93% of

the more than one million motor carriers in the United States had not received a safety rating

from FMCSA.  Brokers thus routinely use "unrated" carriers.

In 2010, at Congress' direction, the FMCSA implemented a program to determine which

carriers should be prioritized for review through the formal compliance review process.  The

program results in FMCSA assigning scores to unrated carriers.  FMCSA bases the scores on the

results of roadside inspections, state traffic enforcement, and other data concerning a motor

carrier's compliance with regulations, as well as on crash data.  The program then uses an

algorithm that is designed to take into account the severity and recentness of each violation, rate

a carrier in seven different categories, and compare the carrier's raw scores to other carriers of

similar size.  The resulting scores are called, "Behavior Analysis and Safety Improvement

Categories" scores or "BASICs."  (Def.'s Mem. Supp. Mot. Summ. J. 6–8, Dkt. No. 25; *see also*

Pls.' Opp'n to Mot. Summ. J. 9, Dkt. No. 31.)  The carrier receives a BASIC score in a particular

category only if there are a minimum number of data points for each category, the required

number of which varies by category.  Using this information, the FMCSA flags carriers for

further review and also designates certain carriers as "high risk" in specific categories.

Although not all carriers have BASIC scores and many do not have them in all

categories, the FMCSA made most of these scores available to the public on its website from

2010 through 2015, and so they were available at the time that Robinson hired Nova to haul the

load at issue.  The website cautioned users, though, that they "should not draw conclusions about

a carrier's overall safety condition simply based on the data displayed in this system." *Alliance*

*for Safe, Efficient & Competitive Truck Transp. v. Fed. Motor Carrier Safety Admin.*, 755 F.3d

946, 948–49 (D.C. Cir. 2014) (discussing disclaimer and describing its origin).  The disclaimer

further noted that unless a carrier had an "unsatisfactory" rating received after a full compliance

review or had been "otherwise ordered to discontinue operations by the FMCSA, it is authorized

to operate on the nation's roadways." *Id.*  As noted, the purpose of the scores was to allow the

FMCSA to target carriers for compliance reviews:  the higher a carrier's ratings, the more likely

it was to be categorized as "high-risk" under this system and then prioritized for compliance

reviews.

Because there was some controversy concerning the utility of the BASICs and their use

by the public or brokers in determining the safety of carriers, Congress directed the Government

Accountability Office (GAO) to investigate whether BASIC scores accurately assessed accident

risk.  The GAO issued a report in February 2014 that was highly critical of the BASIC scores as

a predictive risk assessment tool for individual carriers.  GAO, *Federal Motor Carrier Safety:*

*Modifying the Compliance, Safety Accountability Program Would Improve the Ability to Identify*

*High Risk Carriers*, GAO-14-114 (Feb. 2014), available at

http://www.gao.gov/assets/670/660610.pdf  (last visited July 23, 2017).  (*See also* Def.'s Mem.

Supp. Mot. Summ. J., at Ex. 7, Dkt. No. 25-7 (excerpts from same).)  FMCSA responded to that

report, however, and disagreed with many of its conclusions.

In December 2015, President Obama signed into law the Fixing America's Surface

Transportation (FAST) Act, Pub. L. No. 114-94.[4]  That Act directed FMCSA to remove BASIC

scores from the FMCSA website until the agency addressed the deficiencies identified in the

GAO Report.  FAST Act, § 5223(a).  Thereafter, the FMCSA removed the percentile scores

from its websites, and they are now unavailable to the public.  The FMCSA still uses a warning

symbol to denote those carriers who are considered "high risk" in any particular BASIC

category, though.

At the time Robinson hired Nova, Nova had repeatedly received safety alert warning

symbols, and its monthly scores in the preceding years frequently designated Nova as "high risk"

in several categories, including vehicle maintenance, fatigued driving-hours of service, and

unsafe driving.  (Pls.' Opp'n to Mot. Summ. J., at Ex. H, Dkt. No. 31-8.)  Additionally, from

May 1, 2013, to April 1, 2014, Nova underwent three DOT driver and vehicle inspections.  The

Nova driver was taken out of service for driver safety violations in all three of those inspections,

and the Nova tractor-trailer was taken out of service on two of those three occasions.  *Id.*

Plaintiffs contend that this information, coupled with the other information known to Robinson,

rendered Robinson negligent for hiring Nova to haul the load.

Robinson disagrees.  Its position (and the opinion of its proffered expert, Griffin) is that

the GAO Report is correct and that BASIC scores are inaccurate at best and misleading, at worst.

It argues that the scores do not provide any meaningful guidance to brokers about a particular

---

[4]  The FAST Act was passed about twenty months after the conduct at issue here.

carrier's safety or potential dangerousness.  As a result, Robinson counters, it was not required to

review Nova's BASICs before hiring it and was not negligent for failing to do so.  Instead,

Robinson contends that it acted reasonably and did what a reasonable broker would do—that is,

it confirmed before hiring Nova that Nova: (1) had either a "satisfactory" or "unrated" safety

rating from  FMCSA; (2) had the legally required level of insurance coverage; (3) had "active

licensure,"[5] and (4) was not on a terrorism watch list.  (Br. Supp. Mot. Summ. J. 12, Dkt. No.

25.)

  Critically, then, the parties (and their respective experts) disagree regarding the viability

and usefulness of the BASICs as a predictive measure for which carriers are more likely to be

involved in a crash.  There are studies that support different views of the utility of the BASIC

scores, and the parties discuss them in some detail and discuss possible flaws with each study.

For example, a 2011 article published by FMCSA, but based on an independent evaluation of the

model that creates the BASICs conducted by the University of Michigan Transportation

Research Institute (UMTRI), showed that the crash rate for motor carriers identified with safety

problems in the "Unsafe Driving BASIC" were more than three times greater than the crash rate

for motor carriers not identified with any safety problem.  Also, a 2014 study prepared by John

A. Volpe National Transportation Systems Center (the Volpe Study) showed that six of the seven

BASICs identify carriers with a higher future crash rate than the national average.  An October

2012 American Transportation Research Institute (ATRI) study similarly reported that, for the

five BASICs that were publically available through 2015, carriers with an "Alert" demonstrated

higher crash rates than those without "Alerts" in four BASICs.

  On the other side, of course, is the GAO Report, which was highly critical of some of

those other studies and of the statistical underpinnings of the scores.  The GAO Report

---

[5]  As discussed in the next section, there is a dispute about whether Nova had active licensure at the time.

acknowledged that the Volpe, ATRI, and FMCSA studies may have shown a correlation or association between groups of carriers and which groups had a higher crash risk, but its own analysis focused on whether the violations could predict crash risks for an individual carrier, since that is the level of analysis used by FMCSA to make high-risk determinations.  *See, e.g., GAO Report* at 15 n.27.  The GAO Report specifically noted that BASIC scores were a poor predictor whether a small carrier would later be involved in an accident, *id.* at 30, for two main reasons.  First, the underlying assumption that regulatory violations were correlated with higher accident rates was not borne out; in fact, only two violations (speeding and failure to use a seatbelt) were reliable predictors of accident risk in all the models tested.  *Id.* at 67.  Second, there was a lack of sufficient data on most individual carriers, a problem particularly acute for small carriers.  *Id.* at 16–24.

**D.  Nova's "Operating Authority"**

The parties (and their experts) also dispute whether Nova was prohibited from operating at the time that Robinson hired it for this particular job.  Plaintiffs contend that Robinson failed to act reasonably in hiring Nova because it failed to do one of the four things that even Robinson says it does before hiring a carrier: confirm that Nova had "active licensure."  The issue of Nova's licensure stems from Nova's failure to submit its "Biennial Update" form to the DOT on or before January 31, 2014, when it was due.  Nova was warned in a November 2013 letter that such failure might result in the deactivation of Nova's USDOT number.  The warning also informed Nova that "transportation without . . . an active USDOT number is specifically prohibited [by] 49 U.S.C. [§] 31134 and 49 C.F.R. 392b."  (Griffin Dep. Ex. A-14, Pls.' Mem. Supp. Mot. Exclude Griffin, Ex. A, Dkt. No. 23-1, at 133.)  After Nova failed to file the Biennial Update, FMCSA deactivated Nova's USDOT number, and FMCSA also sent a deactivation

9

letter to Nova that said "Pursuant to 49 CFR 392.9b [the Emiabatas are] prohibited from providing interstate transportation with an inactive USDOT number." (Griffin Dep. Ex. A-16, Dkt. No. 23-1, at 145.)

Based on these letters, Corsi opines that Nova was ineligible to operate on the nation's highways on the date Robinson hired it and at the time of the accidents, a fact that plaintiffs believe Robinson should have known. Robinson's expert, Griffin, includes in his report the contrary conclusion that Nova "was fully authorized to transport freight in interstate commerce on April 1, 2014." (Griffin Report at 2, 4, Pls.' Mem. Supp. Mot. Exclude Griffin, Ex. E, Dkt. No. 23-5.) Griffin opines that the deactivation did not really mean that Nova was not authorized to transport and that the warning letters and deactivation letter are really just meant to scare carriers into filing the update form. He emphasizes that the reasons why a carrier could be placed out of service on a roadside inspection did not include late filing or failure to file the biennial update, and thus he contends that Nova was not really prohibited from transporting. The opinions on this issue will be discussed in context below.

## II. DISCUSSION

The motion for summary judgment, if decided in Robinson's favor on the first issue, would be dispositive of the case, and so the court will address the summary judgment motion before turning to the motions to exclude expert testimony.

### A. Motion for Summary Judgment

Robinson raises three primary arguments in its summary judgment motion. First, it contends that the tort of negligent hiring of a carrier by a broker is completely preempted by 49 U.S.C. § 14501(c)(1), the preemption provision of the Federal Aviation Administration Authorization Act (FAAAA). Second, it argues that plaintiffs' claims are barred by conflict

preemption, because plaintiffs seek to hold Robinson liable for not consulting BASIC scores, but Congress has expressed (through the FAST Act) that BASIC scores are unreliable and should not be followed.  Third and finally, Robinson asserts that, if the court excludes plaintiffs' expert, Corsi, then there is no expert testimony to show the standard of care required of brokers when hiring a motor carrier, and so plaintiffs' claims must be dismissed.

After setting forth briefly the standard governing motions for summary judgment, the court addresses each of these arguments in turn.  For the reasons discussed herein, the court concludes that Robinson is not entitled to summary judgment on any of these grounds.

### 1.  Summary judgment standard

In this case, Robinson's arguments are primarily legal ones.  Nonetheless, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[W]hen a court considers a summary judgment motion, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (en banc) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).

### 2.  Complete preemption

Robinson's first argument is that plaintiffs' negligence claims are completely preempted by federal law under the preemption provision set forth in the FAAAA.  As the Supreme Court has recognized, where Congress has superseded state laws by statute, the court's task is to "identify the domain expressly pre-empted," and the court does that by looking to the statutory language, "which necessarily contains the best evidence of Congress' pre-emptive intent."  *Dan's City Used Cars, Inc. v. Pelkey*, 133 S. Ct. 1769, 1778 (2013) (citations omitted).

11

As described by the Supreme Court, the statute at issue here "prohibits enforcement of

state laws 'related to a price, route, or service of any motor carrier . . . with respect to the

transportation of property.'"  *Id.*  It states:

> Except as provided in paragraph (2) and (3), a state, political
> subdivision of a state, or political authority of two or more states
> may not enact or enforce a law, regulation, or other provision
> having the force and effect of law related to a price, route, or
> service of any motor carrier . . . or any motor private carrier,
> broker, or freight forwarder with respect to the transportation of
> property.

49 U.S.C. § 14501(c)(1).   Paragraphs (2) and (3) then limit the scope of the preemption.

Paragraph 2(A), which plaintiffs contend is applicable here, states: "Paragraph (1) . . . shall not

restrict the safety regulatory authority of a state with respect to motor vehicles."  49 U.S.C.

§ 14501(c)(2)(A).

In support of its argument that plaintiffs' state law negligence claims are completely

preempted, Robinson relies heavily on the Supreme Court's decision in *Rowe v. New Hampshire

Motor Transport Association*, 552 U.S. 364 (2008).  In *Rowe*, the Supreme Court held that two

Maine statutes governing the delivery of tobacco products to minors were completely preempted

by the FAAAA.  *Rowe* is also significant because it notes that the preemption provision in the

FAAAA was modeled after a similar provision in the ADA (the Airline Deregulation Act) and

directs that case law interpreting the ADA preemption provision be used to interpret the

FAAAA.  Indeed, the *Rowe* court explicitly adopted the analysis from the ADA case of *Morales

v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992), and applied it to the preemption

determination under the FAAAA:

> In *Morales,* the Court determined: (1) that "[s]tate enforcement
> actions *having a connection with, or reference to,*" carrier "'rates,
> routes, or services' are pre-empted," 504 U.S., at 384, 112 S. Ct.
> 2031 (emphasis added); (2) that such pre-emption may occur even

> if a state law's effect on rates, routes, or services "is only indirect,"
> *id.,* at 386, 112 S. Ct. 2031 (internal quotation marks omitted); (3)
> that, in respect to pre-emption, it makes no difference whether a
> state law is "consistent" or "inconsistent" with federal regulation,
> *id.,* at 386–387, 112 S. Ct. 2031 (emphasis deleted); and (4) that
> pre-emption occurs at least where state laws have a "significant
> impact" related to Congress' deregulatory and pre-emption-related
> objectives, *id.,* at 390, 112 S. Ct. 2031.

*Rowe*, 552 U.S. at 370–71. The *Morales* Court stated that federal law might not pre-empt state laws that affect fares in only a "tenuous, remote, or peripheral . . . manner," but did not explain where to draw that line. *Rowe*, 552 U.S. at 371 (quoting *Morales*, 504 U.S. at 390).

Robinson points to the *Rowe* court's emphasis on the breadth of the provision. But since *Rowe*, the Supreme Court has cautioned that (1) "the breadth of the words 'related to' does not mean the sky is the limit"; and (2) the language "with respect to the transportation of property" is an additional limitation in the preemption provision of the FAAAA that was not in the ADA and that "massively limits the scope of preemption" of the FAAAA. *Dan's City Used Cars, Inc.* 133 S. Ct. at 1778 (citation omitted). Thus, in order to fall within the scope of the preemption provision, the state law must not only relate to the "price, route, or service" of a broker, but also concern the "transportation of property." *Id.* at 1778–79. Factually, *Dan's City Used Cars, Inc.* is easily distinguishable from this case.[6] But the Supreme Court's exhortation that "related to" does not mean the "sky is the limit" is important to keep in mind here.

Although the Supreme Court has addressed FAAAA preemption, neither it nor any federal court of appeals has addressed whether a personal injury claim against a broker based on negligent hiring is preempted. The parties cite to a number of district court decisions, though. For example, Robinson cites to *Ameriswiss Tech. LLC v. Midway Line of Ill., Inc.*, 888 F. Supp.

---

[6] The plaintiff sued a towing company which took custody of his car after towing it from his landlord's lot without his knowledge, failed to notify him of its plan to auction it, and eventually traded away the car without compensating him. The court concluded that his claims did not relate to the "transportation of property" or a towing company's "service," and so they were not preempted.

2d 197 (D.N.H. 2012), for support.  *Ameriswiss* involved a single-vehicle accident in which
property damage was caused.  The court held that the negligent hiring claims against the broker
(among other claims) were preempted.

Plaintiffs argue that *Ameriswiss*, as well as the other cases cited by Robinson, are all
distinguishable because they involved damage to property rather than personal injuries.[7]
Furthermore, plaintiffs cite to several cases which concluded that complete preemption did not
bar a plaintiff's personal injury claims of negligent hiring against a broker.  *E.g.*, *Montes de Oca
v. El Paso-Los Angeles Limo. Express, Inc.*, No. 14-cv-9230, 2015 WL 1250139 (C.D.C. March
17, 2015) (holding FAAAA did not preempt personal injury claim against transportation broker);
*Owens v. Anthony*, No. 2:11-cv-33, 2011 WL 6056409, at *3 (M.D. Tenn. Dec. 6, 2011) ("The
Court agrees with the numerous courts which have found that personal injury negligence claims
are not preempted by the FAAAA."); *Jimenez-Ruiz v. Spirit Airlines, Inc.*, 794 F. Supp. 2d 344
(D.P.R. June 16, 2011) (concluding that plaintiff's claim for personal injuries sustained while
disembarking an aircraft was not preempted by the ADA).

Two things stand out to the court about these cases and the others cited by the parties.
First of all, *none* of them held that a state law personal injury claim against a broker was
preempted under the FAAAA.  Indeed, Robinson has not cited to a single case where the plaintiff
suffered personal injury as a result of a broker's conduct and where complete preemption was
applied.   Second, the cases holding that such claims are not preempted offer various rationales
for their conclusions, any one of which would be enough to prevent preemption.

---

[7] Plaintiffs also note that the *Ameriswiss* court cites favorably to another case, stating that the applicability
of the preemption provision "hinges on the subject matter and effect of each claim, rather than on the identity of the
parties in the litigation."  888 F. Supp. 2d at 20 (quoting *Yellow Transp., Inc. v. DM Transp. Mgmt. Servs., Inc.*, No.
2:06-cv-1517, 2006 WL 2871745, at *3 (E.D. Pa. July 14, 2006)).  Based on this, plaintiffs argue that a different
rule could—and should—apply to personal injury claims.

Applying *Rowe*, and looking at the analysis in these other cases, the court concludes that plaintiffs' negligent hiring claims are not preempted. First of all, as several other courts have noted, a negligent hiring claim as an avenue for imposing liability for an accident does not have anything more than a "tenuous, remote, or peripheral" connection to the "price, route, or service" of a broker. *Cf. Rowe*, 552 U.S. at 371 (citation omitted). Instead, the court agrees with the *Montes* court that a personal injury suit for negligent hiring is not an attempt to regulate the "services" of a freight broker. No. 14-cv-9230, 2015 WL 1250139, at *1–2.

The stark contrast of the facts in *Rowe* and the facts here emphasize the point. There, the state law at issue was a direct regulation of brokers and dictated the specific manner in which they had to deliver tobacco products. Here, by contrast, the state law is a general law aimed at all persons within the Commonwealth's jurisdiction that requires persons to act with reasonable care in making hiring decisions. Thus, the court concludes that the plaintiffs' claims are not preempted. Furthermore, the Fourth Circuit has demonstrated that whether a claim relates to a "price, route, or service," is an inquiry that can turn on the underlying facts of the specific causes of action. *See, e.g.*, *Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998) (holding that a plaintiff's state tort law claims arising from his claim that the airline refused him permission to board were, as plaintiff conceded, related to a "service" and thus preempted under the ADA; but that those same claims were not preempted to the extent they were based on actions other than the denial of permission to board, such as the airline employee acting outrageously toward him). Here, those facts reflect an attempt by members of the driving public to recover for a broker's alleged negligence is selecting an unsafe motor carrier. This does not have more than a "remote" connection to a broker's "services" and does not have a "'significant impact'" related to

Congress' deregulatory and pre-emption-related objectives." *See Rowe*, 552 U.S. at 370–71

(quoting *Morales*, 504 U.S. at 390).

The court also concludes that, even if the state's negligent hiring claim had a sufficient

impact on the price, route, or service of a broker to satisfy Paragraph (1), it would not be

preempted because it would fall within the general "safety regulatory" exception of paragraph

(2)(A) of the preemption provision. *Owens v. Anthony*, No. 2:11-cv-33, 2011 WL 6056409, at

*3; *see also Morales v. Redco Transport Ltd.*, No. No. 5:14-cv-129, 2015 WL 9274068 (S.D. Tex.

Dec. 13, 2016) (denying broker's motion to dismiss based on FAAAA preemption and adopting

reasoning of *Owens*).[8]

Finally, as a matter of logic, the *Montes* court's explanation that traditional elements of

tort law are usually not preempted by federal legislation is salient. *Montes*, No. 14-cv-9230,

2015 WL 1250139, at *1. As even the Supreme Court has recognized, it "is difficult to believe

that Congress would, without comment, remove all means of judicial recourse for those injured

by illegal conduct." *Id.* (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984)).[9] So

the court will deny summary judgment insofar as it is based on a complete preemption argument.

### 3. Conflict preemption

Robinson's second argument is that conflict preemption bars plaintiffs' claims. Conflict

preemption applies where state law either violates federal law or undermines its purposes.

---

[8] Interestingly, the district court in *Morales* certified the question for interlocutory appeal to the Fifth Circuit, *Morales v. Redco Transport Ltd.*, No. 5:14-cv-129, 2016 WL 7734647 (S.D. Tex. Jan. 13, 2016) (Memorandum and Order reaffirming decision to certify issue for interlocutory appeal), but the appeals court denied leave to appeal in a *per curiam* order. *Morales v. Samsung SDS Am, Inc.*, No. 16-90003 (5th Cir. Dec. 21, 2015) (Order denying leave to appeal from interlocutory order). The case later settled, so the Fifth Circuit never decided the issue.

[9] The court also is uncertain whether a personal injury claim that a broker negligently hired a motor carrier sufficiently relates to the "transportation of property," as is also required to be preempted. Again, the claim of negligent hiring resulting in personal injuries is not about the transportation of property; it is about a failure to use due care in selecting a carrier. But given the other grounds for the court's conclusion that the claims are not preempted, the court does not address that issue.

16

*Mutual Pharm. Co., Inc. v. Bartlett*, 133 S. Ct. 2466, 2473 (2013) ("[T]he Court has found state

law to be impliedly pre-empted where it is 'impossible for a private party to comply with both

state and federal requirements.'") (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)).

Robinson asserts that plaintiffs' negligence claims rely on the use of BASIC scores to

show negligence and thus conflict with the Congressional directive that such scores are not to be

consulted or used by the public because they have not been "shown to reliably reflect carrier

safety." (Def.'s Mem. Supp. Mot. Summ. J. 23–24, Dkt. No. 25.) Plaintiffs counter that the use

of BASIC scores is only a small part of the alleged negligence and that, even if the use of BASIC

scores were precluded due to conflict preemption, they would still have a sufficient basis to

present their negligent hiring claims to a jury.

The court will not grant summary judgment on this ground for several reasons. First of

all, the court agrees that the plaintiffs' negligence claims are not premised solely on Robinson's

failure to review or rely on Nova's BASIC scores and so does not find the claims themselves

preempted. Second, as discussed in more detail below, the court believes there are good-faith

arguments to be made on both sides as to whether or not a reasonable broker in 2014 would have

consulted BASIC scores as part of its decision whether to hire a particular carrier. Thus, the

court does not agree that the FAST Act—which made the scores unavailable to the public as of

December 2015—is so at odds with the claims in this case that is results in conflict preemption.

Relatedly, the court notes that while the FAST Act ordered BASIC scores removed from

"public," carriers still have access to their own scores, and brokers—through their business and

contractual relationships with those carriers—have the ability to obtain those scores, as well. For

all of these reasons, the court concludes that conflict preemption does not preclude plaintiffs

from arguing that Robinson's failure to consult BASIC scores was negligent.

### 4.  Potential lack of expert testimony

Robinson's third ground for summary judgment is based on the premise that the court should exclude the opinion testimony of plaintiffs' expert, Corsi, as to the standard of care that applied to Robinson's conduct.  For the reasons set forth below, however, the court is not striking Corsi's testimony on this issue.  This third ground is thus moot.

## B.  Motion to Exclude Robinson's Expert, Griffin

The court turns next to plaintiffs' motion to exclude Robinson's expert, David Griffin. Griffin is a former employee at the FMCSA, where he worked for decades as a field agent.  His duties involved conducting FMCSA regulatory inspections of trucks and buses.  He now owns a consulting business, in which he performs mock compliance reviews for motor carriers and testifies as an expert.  Robinson intends to have Griffin offer the following four opinions, which are in his report and which he reaffirmed during his deposition:

1.  FMCSA is the agency that determines who can transport freight and passengers on U.S. Highways (As part of this, he notes that 93% of carriers have a safety rating of "unrated," which is the rating Nova had);[10]

2.  Nova was subject to the federal motor carrier safety regulations and fully authorized to transport freight on the date of the accident, 4/1/2014;

3.  Robinson's selection of Nova as a motor carrier "was reasonable and appropriate";  and

4.  Corsi's report contains erroneous and misleading statements and demonstrates a lack of knowledge of the FMCS regulations.

Plaintiffs seek to exclude Griffin's testimony on three basic grounds.  First, they contend that he is unqualified to offer an opinion as to the standard of care brokers use to select carriers

---

[10]  As to this first conclusion, plaintiffs respond that the fact that the FMCSA regulations apply to Nova will be stipulated by the parties. (Pls.' Mot. to Exclude at 5, ¶ 8.)  But the court concludes that Griffin is qualified to offer the opinions set forth in Conclusion 1, and if Robinson wants to call him to explain that information, it may do so.

because, as a truck inspector, he has no knowledge or expertise in that area.  They rely heavily

on Griffin's own testimony that they say shows he does not know how brokers select carriers.

They also rely on the fact that he "has not published, researched or educated himself about

freight broker methodology for selecting motor carriers . . . ."  (Pls.' Mem. Supp. Mot. Exclude

Griffin 7, Dkt. No. 23.)

Second, plaintiffs assert that Griffin's opinions in conclusions 2 and 3 are speculative and

not based on valid knowledge.  As to conclusion 2, they characterize his conclusion that Nova

was fully authorized to transport freight on the date of the accident as being an opinion that the

FMCSA's letters to Nova do not mean what they say, and plaintiffs complain that he offers no

real support for that opinion.  They further contend that Griffin has not relied on any writing

from the FMCSA to support his strained interpretation of this letter.  They also point out that

Griffin's opinion regarding the effect of the activation letter is based on his experience with the

FMCSA, which ended in 2011, and that the rulemaking establishing the enhanced enforcement

penalties (including prohibiting interstate transport) were put into effect in November 2013.

Accordingly, plaintiffs contend that his conclusion is "outdated."  (Pls.' Mem. Supp. Mot.

Exclude Griffin 18, Dkt. No. 23.)

As to conclusion 3, plaintiffs argue that Griffin's opinions on the validity of BASIC

scores are "purely speculative" because he is unfamiliar with all of the studies analyzing the

scores and does not know various background information about Nova's BASICs, in particular.

Third and finally, plaintiffs argue that Griffin should not be permitted to "attack the

credibility" of plaintiffs' expert, as detailed in his fourth opinion.  The court addresses each of

these arguments, after first setting forth the applicable legal standards.

19

### 1. Standards concerning admissibility of expert testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and allows

such testimony if a witness is "qualified . . . by knowledge, skill, experience, training, or

education." Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

(1993), the Supreme Court explained that Rule 702 imposes on a district court a gatekeeping

responsibility to "ensur[e] that an expert's testimony both rests on a reliable foundation and is

relevant to the task at hand." *Id.* at 591. As the Fourth Circuit recently explained:

> Relevant evidence . . . is evidence that helps "the trier of fact to
> understand the evidence or to determine a fact in issue." *Id.* at 591.
> (internal quotation marks omitted). To be relevant under *Daubert*,
> the proposed expert testimony must have "a valid scientific
> connection to the pertinent inquiry as a precondition to
> admissibility." *Id.* at 592.
>
> With respect to reliability, the court must ensure that the proffered
> expert opinion is "based on scientific, technical, or other
> specialized knowledge and not on belief or speculation, and
> inferences must be derived using scientific or other valid
> methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th
> Cir. 1999).

*Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017).

In addressing reliability, the court can look at such factors as whether the testimony "can

be (and has been) tested," "whether the theory or technique has been subjected to peer review

and publication," the known potential rate of error, and "whether the theory or opinion is

generally accepted." *Nease*, 848 F.3d at 229 (citations omitted).

### 2. Griffin's qualifications

In assessing an expert's qualifications, it is crucial that the "expert's background . . .

show qualification sufficient to permit expression of an opinion that is borne of the specialized

knowledge or expertise which allows the expert to give opinion evidence in the first instance."

*Anderson v. Nat'l R.R. Passenger Corp.*, 866 F. Supp. 937, 943 (E.D. Va. 1994). In applying that concept here, the court first concludes that Griffin has the experience and expertise to testify about his opinions in Conclusion 1, 2, and 4 of his report. He is very familiar, and has extensive experience, with the regulations governing motor carriers, with the types of violations that would put a carrier out-of-service, and with the FMCSA's enforcement mechanisms. Conclusion 1 and portions of Conclusions 2 and 4 concern those subjects, and so he has adequate experience to offer opinions on those topics, with the additional limitations set forth herein.

The entirety of his deposition testimony makes clear, though, that Griffin lacks adequate experience or training to testify concerning the appropriate standard of care for a broker to employ when hiring a carrier. He has no experience with, or specialized knowledge about, how brokers make their decisions to hire motor carriers. He does not know what systems most brokers use and has not really worked with brokers in practice or in his consulting business (except as a side business in his consulting for motor carriers who also broker loads). Instead, based on his report and his deposition, it appears to be mostly just his personal opinion that brokers should simply rely entirely on the FMCSA to determine the safety of any carrier. He has no real expertise, however, on the question of what is reasonable and customary in the industry. In short, the court agrees with plaintiffs that Griffin is not qualified to offer an opinion that Robinson comported with the standard of care. Accordingly, he will not be permitted to offer the opinion set forth in Conclusion 3 regarding the standard of care in this case. *See, e.g., Robinette v. Wal-Mart Stores, Inc.*, No. 2:15-cv-3, 2016 WL 8737153, at *4 (W.D. Va. Feb. 5, 2016) (holding that an engineering expert, although "more than qualified" to testify about the force necessary to tip the object that injured the plaintiff, could not testify about the standards required

of the retailer in securing its merchandise on a shelf where he had no experience and had done no research in the retail industry).

### 3. Griffin's opinions about BASIC scores

Although the court finds that Griffin has inadequate experience to opine on the standard of care for brokers, the court concludes that Griffin is qualified to offer an opinion as to the utility of BASIC scores for the transportation industry. While he is not a statistician and did not have specialized knowledge about the statistical terms used in some of the reports cited by Corsi, he was familiar with the GAO Report and with some of the other studies that had looked at the validity of the scores. He also was familiar with the general literature concerning BASICs and the potential problems identified with them. For example, he explained and echoed some of the problems noted in the GAO Report with the small sample size, differences in reporting among states, how the statistics could become skewed against smaller carriers due to their fewer number of data points as to them, etc. As noted, he did not have an in-depth understanding of the statistical analysis. But while his lack of knowledge of statistics can certainly be a basis for cross-examination, he has more specialized knowledge than the average juror about the ratings, how they are calculated, and the criticisms of them in the industry. So, the court will allow him to offer opinions about BASIC scores, but not to offer any opinion about whether or not Robinson complied with the standard of care in not consulting those scores.[11]

The court recognizes that the parties strongly disagree about whether the scores are "junk science," as Robinson contends, or a useful tool for brokers looking to evaluate carrier safety, as plaintiffs urge. But, this court, in exercising its discretion, "need not determine that the proffered

---

[11] Plaintiffs also point out that Griffin's testimony is undermined by his opinions in another case (the *Rivera* case), in which he said that BASIC scores could be useful in evaluating a carrier who has a conditional rating because they are more recent. The court does not believe that this invalidates his opinions in their entirety, but it is obviously an issue that can be raised by plaintiffs on cross-examination.

expert testimony is irrefutable or certainly correct"; instead, it must only find that the testimony is "reliable and relevant and thus admissible under *Daubert*." *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006) (quoting *Daubert*, 509 U.S. at 596). "As with all other admissible evidence, expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* (quoting *Daubert*, 509 U.S. at 596). Having reviewed the parties' briefing and exhibits on this issue, the court concludes that whether Griffin's (and Corsi's) opinions are *correct* is an issue the jury may consider in deciding their weight, but it does not affect their admissibility.

The GAO office, an independent body, has criticized the BASIC scores, and the GAO's criticism appears sound to the court, on many grounds. But despite the flaws in methodology identified by the GAO office, the FMCSA—the very government agency tasked with monitoring and trying to increase the safety of motor carriers on the nation's highways—has responded by defending the scores as a useful tool in that endeavor. Furthermore, as applicable here, even a methodology that does not accurately predict *individual* carrier safety, but does have some predictive value for groups of carriers, could be helpful to a broker trying to determine who to hire. The court need not decide which of the experts' competing opinions is correct. That is not its job. *See Moreland*, 437 F.3d at 431. Instead, its job is to determine whether each one, standing alone, has a reasonable basis. And the court concludes that both do have a reasonable basis. Accordingly, the court will allow both experts to offer their opinions about the scores and their usefulness.[12]

---

[12] There is also an issue of timing in this case. That is, although Robinson relies heavily on the FAST Act and the GAO Report criticizing BASICs, the issue before the jury is what the relevant standard of care was *in March 2014*, when Robinson hired Nova. At that time, BASICs were still publicly available, and, although flaws with them had been brought to the attention of the FMCSA, they were still being made available to the public.

### 4.  Griffin's opinions about Nova's operating authority[13]

Plaintiffs next challenge Griffin's opinion on Nova's operating authority as being a statement of rank speculation.  They assert that he is simply offering—without any reasonable basis and without citation to any authority—an opinion that effectively says the letter to the Emiabatas does not really mean what it says.   And they contend that he is doing so without any citation to authority or legal authority.

Robinson counters that Griffin's opinion is based on, and supported by, both "the URS regulations" (which it does not cite to with more specificity) and FMCSA's myth/answer powerpoint slide.  (*See* Def.'s Opp'n to Mot. Exclude Griffin 10, No. 7:16-cv-102, Dkt. No. 53.) That is, a February 2014 training presentation from the FMCSA contains a slide saying it is a "Myth" that the failure to file a biennial update will result in a carrier being taken out of service at roadside.  Instead, the FMCSA advised that "failing to complete the Biennial Update is not part of the out of service criteria; however [sic] it is a violation and will result in a roadside citation."  (*Id.* (quoting, but not attaching as an exhibit, that portion of the powerpoint).) Robinson contends that both the slide and the regulations suggest that a carrier could continue to operate even if it fails timely to submit its biennial update.  It also notes that Griffin's opinion that a failure to file that form would not result in a motor carrier being put out of service is based on years of experience.  He testified repeatedly—and consistently—that such a failure to file is not an out-of-service situation, and that, while an officer on the roadside could write a ticket for anything in the whole regulation book, he has "never heard of [an officer writing a ticket for failure to file a biennial update] before."  (Griffin Dep. (Day 2) 37, Dkt. No. 23-1, at 44.)

---

[13]  In his report, Griffin uses the term "operating authority."  As discussed herein, there may be a distinction between a carrier that lacks "operating authority" and a carrier that is "prohibited from transportation."  Until the court can determine whether there is such a distinction and whether it has any legal or practical significance, the court's use of one or the other in this opinion should not be attributed any particular significance.

With regard to Griffin's opinion that the letters to Nova about it being "prohibited" from interstate transportation do not mean what they say, the court will take under advisement this portion of the motion to exclude and will allow the parties to provide additional information clarifying this issue either at the pretrial conference or at trial. As discussed in more detail below, the court has concerns about this purported opinion and believes that additional (or clarifying) information would assist the court in ruling.

*a. Robinson's knowledge of the inactive DOT number*

As a preliminary matter, there is some debate about whether, even assuming that Nova's operating authority had been revoked, Robinson had the ability to know or learn that fact. That is, Robinson insists that it did not know—and had no way of knowing—that Nova's DOT number was inactive because of its failure to file a biennial update form.

Both experts seemed to believe, at the time they testified, that Robinson would not have been able to learn of Nova's inactive DOT number at the time. For example, Corsi testified that he did not know whether the information was publicly available on FMCSA's website in March 2014, such that Robinson could have seen it, and instead stated that this could be determined—if at all—only by making a FOIA request to the FMCSA, which neither he nor plaintiffs had done. (Corsi Dep. 29–30, Def.'s Mem. Supp. Mot. to Exclude Corsi, Ex. 2, Dkt. No. 27-2, at 3–4.) Similarly, Griffin, Robinson's expert, testified that the information was not available to Robinson at the time. (Griffin Dep. (Day 2) at 52, 60, Pls.' Mem. Supp. Mot. Exclude Griffin, Ex. A, Dkt. No. 23-1, at 47, 49.) Griffin went one step further, testifying that Nova's "authority history" available on FMCSA's website shows that Nova had full authority to operate as a motor property common carrier between September 9, 2009 and June 30, 2014.

The records before the court, however, show that Robinson did have access to—or the ability to access—some of this information.  Robinson had a contractual relationship with an entity called DAT Solutions, LLC (DAT), by which DAT provided (or made available) daily and up-to-date information about carriers to Robinson.  (Johnson Dep. 50–51, 183–84, Pls.' Opp'n to Mot. Exclude Corsi, at Ex. C, Dkt. No. 33-3 (deposition of Rule 30(b)(6) representative for Robinson, stating that Robinson obtained daily updates confirming operating authority).)  Specifically, according to the "Clarification" provided by DAT in response to a subpoena, DAT provided carrier notifications to Robinson in two ways at the time of these events.  (Pls.' Opp'n to Mot. Exclude Corsi, at Ex. D, Dkt. No. 33-4.)  One of them, which was available to Robinson through its DAT subscription, but not automatically "pushed" to Robinson, was a daily FTP file.[14]  The FTP file was sourced from the FMCSA and "contain[ed] information for all carriers active on that particular day."  (*Id.*)  The daily FTP file contained a list of all carriers with both an active MC number and an active DOT number.  For the dates of March 27, 2014 (the day before Robinson hired Nova), through April 9, 2014, Nova would not have appeared on that daily list because its DOT number was inactive due to its failure to submit its biennial update.  So, had Robinson checked the daily FTP file from DAT on the day it hired Nova to haul the load, it would have seen that Nova was not listed as active.  At the same time, though, the information DAT obtained from the FMCSA for Nova Express's MC number showed Nova's "operating authority" as "Active" on the date it was hired and through the accident.[15]

---

[14]   The second type of information involves emails sent to Robinson, "per their pre-selected criteria," for all carriers on Robinson's "watchlist."  But Robinson never included Nova on its "watchlist," and so it never received any notices about Nova from DAT.  (Pls.' Opp'n to Mot. Exclude Corsi, Ex. D, Dkt. No. 33-4, at 1.)

[15]   This is the history and information Griffin relies on to say that Nova had operating authority at the time; it comes from the "FMCSA Licensing and Insurance web site."  (Griffin Report 3, Pls.' Mem. Supp. Mot. Exclude Griffin, Ex. E, Dkt. No. 23-5.)

Based on this discrepancy, the court believes there is at least some evidence that, by

obtaining and examining the information made available by DAT, Robinson could have learned

that Nova did not appear on the "active" list and thus that Nova did not have both an active MC

and an active DOT number. Robinson would have had to inquire further in order to determine

which was missing and why, and the court is not clear whether Robinson would have been able

to obtain that information without a FOIA request.

### b.  *The significance of the deactivation of the DOT number*

Assuming Robinson knew or could have known the status of Nova's DOT number and

MC number, there is still an open question as to whether Griffin or Corsi should be able to offer

an opinion about what the suspension of both or either one of those numbers means. Critically,

no party has explained the difference between a MC number and a DOT number or whether both

were required to be active for Nova to legally haul the goods it was hauling. To be sure, the

letter of deactivation says that the Emiabatas were prohibited from interstate transportation. The

regulation referenced in the letter is titled "Prohibited Transportation" and says that "[a]

commercial motor vehicle providing transportation in interstate commerce must not be operated

without a safety registration and an active USDOT Number." 49 C.F.R. § 392.9b(1). The

penalties provided for a violation for transporting without an active USDOT number refer to 49

U.S.C. § 521, which lists solely fines for "recordkeeping and reporting violations." 49 U.S.C. §

521(b)(2)(B). Nothing in that regulation or statute provides for a carrier to be placed out of

service for this type of violation, though.

The regulation immediately preceding that one, 49 C.F.R. § 392.9a—which is *not*

referenced in the deactivation letter), is titled "Operating Authority." It states that a motor

carrier that provides transportation without the required operating authority "shall be ordered out

27

of service" and "may be subject to penalties in accordance with 49 U.S.C. § 14901." And, as noted, FMCSA had Nova as having "Operating Authority" (via its MC number) until after the date of the accident. Additionally, FMCSA's website repeatedly refers to the MC number as designating interstate "Operating Authority." *See, e.g.,*

https://www.fmcsa.dot.gov/registration/get-mc-number-authority-operate (last visited July 26, 2017) ("FMCSA operating authority is often identified as an 'MC' . . . number" and noting that the process for obtaining "operating authority" is distinct from the "USDOT Number application process"). Griffin's theory, therefore, that a carrier could be "prohibited" based on an inactive DOT number, but still have "operating authority," is not totally without foundation.

At this point in time, the parties have not provided the court with adequate legal analysis as to what exactly these terms mean. Regardless, the court is concerned that Griffin's opinion on this issue (and Corsi's, too) could invade the province of the court to determine the law. That is, to the extent the consequence of the inactive DOT number is a matter of interpreting the regulations, that is a legal issue and not a proper subject for expert testimony. *Teague v. Bakker*, 35 F.3d 978, 993 & n.21 (4th Cir. 1994) (noting that it was "grave error" for the district court to allow "expert testimony as to the proper interpretation of applicable domestic law"); *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 368 (4th Cir. 1986) (affirming trial court's exclusion of expert testimony where expert was testifying about "the meaning and applicability of the securities laws" or giving his "expert opinion on the governing law"), *disapproved on other grounds*, *Pinter v. Dahl*, 486 U.S. 622 (1988). If the parties can provide additional clarification or analysis of this issue, the court will issue a ruling prior to trial. Until then, it takes the issue under advisement.

### 5.  Griffin's "attacks" on Corsi

Plaintiffs also seek to prevent Griffin from "attacking the credibility" of Corsi, as they believe he has done in his report.   To the extent Griffin is permitted to offer opinions on subjects that contradict Corsi's, Griffin is also permitted to testify about why he believes Dr. Corsi is incorrect in his opinions.  That is a common function of an expert witness.  The court will caution both parties, however, to have their experts avoid personal attacks on any other witness.

### C.  Motion to Exclude Plaintiffs' Expert, Corsi

Robinson has also filed a motion to exclude, in its entirety, the testimony of Thomas M. Corsi, Ph.D., who plaintiffs offer as an expert.  Robinson asserts three main reasons that Corsi should be prohibited from testifying.  First, Robinson contends that he is not qualified to opine on the standard of care for freight brokers because he lacks relevant job experience and lacks relevant practical knowledge.  It complains that he bases his opinion on anecdotal reports and his experience testifying as an expert witness.

Second, Robinson argues that Corsi's opinion that Robinson should not have contracted with Nova because Nova had been suspended from service is incorrect and also presupposes, without any evidence, that the information was publicly available to Robinson when it hired Nova Express.

Third, Robinson contends that Corsi's opinion that Robinson should have consulted Nova Express's BASIC scores is incorrect because those scores have been discredited in various studies and they are particularly unreliable as to small carriers like Nova.  The bulk of Robinson's motion is devoted to a discussion of this third issue and, in particular, to arguments about the statistical invalidity of the BASIC scores.  Robinson repeatedly refers to the scores as "junk science" and argues that the court should exercise its gatekeeping function under *Daubert*

and not permit Corsi to offer any opinion that is premised on a purported duty by Robinson to review or consider Nova's BASICs.   The court discusses each of these arguments in turn.

### 1.  Corsi's qualifications

Corsi has extensive qualifications concerning the subject matter of several of his opinions, but Robinson contends that he should not be permitted to testify about the standard of care for brokers because he has never worked for a broker or otherwise been involved in the pragmatic decision-making of brokers.  The court disagrees and will allow Corsi to testify about a broker's reasonable standard of care in 2014.

It is true that, in *Jones v. C.H. Robinson Worldwide, Inc.*, 558 F. Supp. 2d 630, 653 (W.D. Va. 2008), the court did not allow Corsi's testimony about the standard of care employed by brokers, but the court's rationale was that Corsi came into his knowledge about standard broker practices in the days before his deposition, merely by looking at a few broker websites. The court reasoned that this was an insufficient basis for expert testimony.  *Id.* at 654 ("Dr. Corsi will not be permitted to testify with regard to any opinion he has formed with regard to carrier selection practices based upon the rather informal internet survey he performed immediately prior to this deposition testimony.")

The opinion in the *Jones* case, however, was in 2008.  In the nine years since, Corsi has continued to learn about broker practices, albeit in the context of serving as an expert witness. His report details information about how brokers incorporate BASIC scores into their determination of whether or not to use a particular motor carrier.  (Def.'s Mem. Supp. Mot. Exclude Corsi, Ex. 1, Dkt. No. 27-1, Corsi Report at 20–22; *see also* Corsi Dep. 59–60, Def.'s Mem. Supp. Mot. Exclude Corsi, Ex. 2, Dkt. No. 27-2) (Corsi explaining that he has examined the practices of freight brokers over a 13-year period, has "seen the practices, examin[ed] their

practices on a consistent basis, read[] about them in literature, and also look[ed] at the stated practices that they have on their websites, and [is] familiar with those policies and practices").) Although much of that information was gleaned through his work as an expert witness testifying against brokers, it is nonetheless information about which he has specialized knowledge and that the court believes would assist the trier of fact. Thus, Corsi will be permitted to offer an opinion regarding the standard of care. *See also Riley v. AK Logistics*, No. 1:15-cv-69 (E.D. Mo. June 9, 2017) (Memorandum & Order, ECF No. 119) (determining that Corsi was qualified to offer an opinion about the standard of care for motor carrier safety in the freight broker industry and permitting him to testify that Robinson, as a broker, had a duty of care and what that duty would have entailed).

### 2. Corsi's opinion regarding Nova's authority to transport

As noted when discussing Griffin's opinion on the issue of Nova's operating authority, the court remains unclear about the status of Nova's authority to transport at the time Robinson hired it. Certainly, the letters to Nova clearly state that it was prohibited and those letters, with proper foundation, may be introduced as evidence in the case. Similarly, if it is otherwise admissible, the parties may also introduce evidence from FMCSA's website or from the DAT records that show Nova's status on the relevant dates. At this point, however, neither expert will be permitted to offer an opinion as to the legal significance of those facts or the meaning of the regulations or statutes governing the issue. Instead, the court will take the issue under advisement and await clarifying or additional information from the parties.

### 3. Corsi's opinion regarding BASIC scores

For similar reasons as discussed above as to Griffin's opinion on the BASIC scores, the court will allow Corsi to offer his opinions about the BASIC scores and his opinion that brokers

do and should rely on them when making decisions about which carriers to use.  As already noted, there certainly are disputes in the industry literature about the usefulness of these scores. The GAO Report, in particular, points out some significant flaws in the methodology from the perspective of identifying *a particular carrier's* crash risk.  But FMCSA continues to use the scores and, at the time of Robinson's alleged negligence, they were still available on FMCSA's website.  Thus, the court cannot say that there was not a reasonable basis for brokers to use them as part of their decision.  Indeed, even Griffin admitted as much in his deposition.  (Griffin Dep. Day 1, at 119, Dkt. No. 23-1, at 30 (testifying that BASOC scores are "a small part of what you can look at" as an indication of overall safety condition, although they are not "a great indicator").)  Accordingly, the court will allow Corsi's testimony on BASIC scores.

### III. CONCLUSION

For the foregoing reasons, the motion for summary judgment will be denied, the motion to exclude Griffin's testimony will be granted in part, denied in part, and taken under advisement in part, consistent with this opinion, and the motion to exclude Corsi's testimony will be denied in part and taken under advisement in part.  An appropriate order will be entered.

Entered: July 27, 2017.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge